# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

SPENCER KREBS, MORGAN SWITZER,
DAVE WYATT, and CHESTER ROBERTS,
on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.                                       Civil Action No. 16-C-_____

CHARLOTTE SCHOOL OF LAW, LLC,
a North Carolina company,
INFILAW CORPORATION, a Delaware Corporation,
JAY CONISON, Dean of CSL,
CHIDI OGENE, President of CSL,
DON LIVELY, former President of CSL,
and the UNITED STATES DEPARTMENT OF
EDUCATION, a governmental agency,

      Defendants.

## COMPLAINT

Plaintiffs, individually and on behalf of all persons who currently attend the Charlotte School of Law (CSL) during the relevant time period (collectively "Plaintiffs"), allege as follows. Plaintiffs' allegations are based on the investigation of counsel, the United States. Department of Education (DOE), and the American Bar Association (ABA), including but not limited to reviews of advertising and marketing material, various publicly available information, and interviews of students, and are thus made on information and belief, except as to individual actions of Plaintiffs, as to which Plaintiffs have personal knowledge. Upon information and belief, more than two-thirds of all members of the putative class, at all material times relevant to the allegations of this Complaint, were residents of the State of North Carolina and are current students of the CSL.

## INTRODUCTION

1.      The Plaintiffs bring this action to recover declaratory relief, damages, civil penalties, fees and costs under the North Carolina Deceptive Trade Act and other numerous common law and equitable theories.

2.      CSL is a private institution owned by a large for-profit education investment fund, InfiLaw Corporation (InfiLaw), which also owns and operates two other for-profit law schools, and, in turn, is owned by Sterling Partners, a Chicago private equity firm with nearly $4 billion under management.  The school first opened in 2006, and was formally accredited by the ABA in 2011.  Upon information and belief, it currently enrolls over 900 students, making it one of the largest law schools in the country, while it has some of the lowest admissions standards for any accredited law school, admitting nearly 65 percent of all applicants.

3.      Since its accreditation approval in 2011, CSL has marketed and represented itself as having "been awarded full accreditation" by the ABA in 2011, which required the school "ha[ve] *full compliance with each of the ABA's standards*, including standards *relating to bar passage*, *job placement and diversity*." *See CSL Mission Statement*, attached hereto as *Exhibit A*.

4.      Since its accreditation approval in 2011, CSL has marketed and represented itself as having "a rigorous curriculum [that] has been created to ensure that our students are equipped with practical skills that will allow them to thrive in a professional setting. Students are taught not only the traditions and theory of law, but also how to apply this learning through critical thinking and analytical skill sets. We address what using a law degree in 'real life' can mean to an individual both personally and professionally." *See Exhibit A.*

5.      In marketing and representing itself to current and prospective students, CSL claims that "[s]tudent success is of the utmost importance to everyone at the institution, on every

level." *See Exhibit A.* However, far from doing what's best for its legions of students, CSL consigns the majority of them to years of indentured servitude, saddling them with hundreds of thousands of dollars in crushing, non-dischargeable debt that will take literally decades to pay off. CSL, in conspiracy with other named Defendants, have done this while knowingly misrepresenting its status of being in compliance with ABA requirements, as it was notified as far back as 2015 by the ABA that it "had not demonstrated compliance with certain ABA standards." *See DOE Denial of Recertification Application to Participate in Federal Student Financial Assistance Programs Letter*, at 3, attached hereto as *Exhibit B.* Despite being fully aware of the ABA's announcement in 2015, CSL failed to make "any public statements that would have informed a student or prospective student that the ABA had found the school to be out of compliance with the Standards." *See Exhibit B*, at 10.

6. On February 3, 2016, the ABA announced that CSL "was not in compliance" with other ABA standards, specifically with:

> Standards 301(a), 501(a), 501(b), and Interpretation 501-1, in that the Law School has not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession; maintaining sound admissions policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education; or is admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.

*See Exhibit B,* at 4.[1]

---

[1] Standard 301(a): "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." Standard 501(a): "A law school shall maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education." Standard 501(b): "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar." Interpretation 501-1: "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

7.     However, despite being fully aware of the ABA's second announcement on February 3, 2016, CSL did not amend, update, or otherwise correct its continuing and misleading representation on its website." *See Exhibit B,* at 11.  This is not the first time that Defendant Jay Conison has been the Dean at a law school that has been found to not be in compliance with ABA Standards for admission practices.  Just recently, the ABA issued a public censor on Valparaiso Law over past admission practices while Jay Conison was Dean. *See Valprarasio Public Censure Article*, attached hereto as *Exhibit C*.  Defendant Jay Conison inevitably took a position as Dean at CSL in 2013, but his non-compliant practices apparently followed him to Charlotte, North Carolina.

8.     In July 2016, the ABA issued its third decision, again finding CSL to be out of compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1.  In this decision, the ABA also announced its conclusion that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 are *substantial and have been persistent*." *See Exhibit B,* at 5. The Committee also found that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." *Id.*  The decision was expressly based on forty-four factual findings, on topics such as admissions, programming for admitted students, mentoring and related opportunities, the writing program, academic support, faculty, summer and intersession changes, attrition, bar preparation during law school, post-graduation bar preparation, and bar examinations. *Id.*

9.     Following the ABA's third decision, CSL again substantially misrepresented its compliance with ABA requirements to current and prospective students, as it again failed to amend, update, or otherwise correct its continuing and misleading representation on its website. In its argument against the ABA, CSL even conceded that "if students and prospective students

were aware of the ABA's findings of noncompliance, that would have a "profound impact on admissions" because: (1) knowledge of the ABA's findings would make applicants "much less likely to enroll;" and (2) such a disclosure would "effectively tell applicants to beware of attending the Charlotte School of Law." *See Exhibit B*, at 11-12. In addition, CSL argued to the ABA that public disclosure of its noncompliance would "have an adverse impact on [CSL's] ability to retain high-performing students," because it would "inevitably create anxiety on the part of high-performing students and make their transfer more likely." *See Exhibit B*, at 12. Thus, under CSL's own arguments, the truth about its noncompliance would have impacted the decisions made by prospective students and current students to either enroll or continue their studies at CSL.[2]

10. On November 14, 2016, the ABA found for the fourth time in almost two years that CSL was not in compliance with its Standards. On this date, the ABA found that CSL "not in compliance" with Standards 301(a), 501(a), and 501(b), that the issues of noncompliance with these standards "are substantial and have been persistent," and that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." *See Exhibit B*, at 7. Because CSL had failed to disclose to its current and students its non-compliance with ABA Standards prior to November 14, 2016, the ABA ordered remedial actions, including public disclosure, and placed CSL on probation, effective November 14, 2016. *Id.* Therefore, CSL did not make any type of public disclosure regarding its non-compliance with ABA requirements for rigorous curriculum, admissions process, bar passage rates, and attrition rates until it was forced

---

[2] As part of CSL's appeal to the ABA, the ABA provided a market study that tested the impact of disclosure on CSL applicants. *See Exhibit B*, at 12. The study analyzed the views of individuals with LSAT scores above 142 who had applied to one or more of the InfiLaw schools. *Id.* These individuals were asked to assess the impact on the likelihood of their respective enrollment at a particular law school if acceptance materials from that school included a statement that the school failed to meet accreditation standards dealing with admissions, educational programs, and bar passage. *The study concluded that approximately 3 in 4 applicants (or 74%) stated that they would be "much less likely to enroll" after reading such a statement – establishing that reasonable students were highly likely to rely on the disclosure of information regarding the accreditation failures that CSL sought to keep from public view.* Id.

to do so, leaving current and prospective students shocked, as it was their first time hearing about CSL's noncompliance.

11.     On December 19, 2016, after reviewing the ABA's findings, the DOE denied CSL's Recertification Application to Participate in the Federal Student Financial Assistance Program, as it found that CSL had "substantially misrepresent[ed] the nature of its educational program" to the DOE and current and prospective students in order to gain prospective students' admission and prevent current students from transferring. *See Exhibit B*.  As CSL's tuition costs are a staggering $44,284.00 per year, without financial aid, current students are now unable to complete CSL's Juris Doctorate (JD) program, and are left wondering where to go and what to do in order to become an attorney and pay off their massive amount of student debt.[3] *See CSL Tuition Data*, attached hereto as *Exhibit D*.

12.     CSL's deceptions and misrepresentations were perpetuated so as to prevent prospective students from realizing the obvious -- that attending CSL and spending well over $100,000.00 in tuition payments is a terrible investment which makes little economic sense, and prevents current students from transferring and continuing to affect CSL's already non-compliant attrition rate.  As CSL has already conceded; if students and prospective students were aware of the ABA's findings of noncompliance, it would have had a profound impact on admissions because: (1) knowledge of the ABA's findings would make applicants "much less likely to enroll;" and (2) such a disclosure would "effectively tell applicants to beware of attending the Charlotte School of Law." *See Exhibit B*, at 11-12.  Knowing this, CSL continued to fraudulently represent and market itself as being in compliance with ABA Standards to the detriment of all current students who now have nowhere to turn.

---

[3] According to CSL's website, the median amount of debt for program graduates is $161,910.00.

13.     Since the December 19, 2016, DOE denial letter, Defendant CSL, Jay Conison, Chidi Ogene, nor InfiLaw have made a public statement to inform its current students on the status of the school's compliance with the ABA or DOE requirements.  In fact, immediately after the December 19, 2016, DOE denial letter, *See Exhibit B*, students in fear of their future attempted to meet with Jay Conison, Chidi Ogene, and InfiLaw representatives, but CSL locked its seventh floor doors and cut off the elevator access to the seventh floor, thereby leaving current students without any answers.  Not only have current students been uninformed of CSL's non-compliance with ABA standards, but certain faculty at CSL claim Defendant Jay Conison, Chidi Ogene, and InfiLaw kept the details of its non-compliance hidden from them as well.  Outraged that neither CSL nor InfiLaw have made any public statements to inform and assist students and also themselves, the faculty sent an open letter to current students, stating:

> Since Monday, December 19, faculty members of CSL have met to discuss the current school **crisis caused by the actions, and inactions, of key decision-makers**.  The outcome of the meetings was to prioritize communications to our student body and to **insist to Infilaw that the school must change the way it is governed.**
> . . .
> Students, we share in your feelings of sadness, anger, and disappointment.  At this juncture, **we are insisting that Infilaw recognize that decisions about admissions and curriculum must be made by the faculty.**  These decisions are the subject of our current situation and were made without the benefit of those best able to protect the students' interests.
> . . .
> **The missteps of key decision-makers** should never overshadow the positive contributions and capabilities of our students and alumni.

*See Faculty Open Letter to Students*, attached hereto as *Exhibit E*.

14.     CSL, in conspiracy with the other named Defendants, knowingly advertised and represented false claims and statements as to the viability and credibility of CSL's JD program in order to obtain and keep the Plaintiffs' property.  CSL and the other conspiring Defendants, by

enrolling the Plaintiffs at CSL into a false and misrepresented JD program, took millions of dollars from the Plaintiffs, which now will be even more difficult to pay back as CSL in on probation, thereby lessening the worth of current students' *potential* degree.[4]

15.     As further evidence of CSL's profit-motivated practices, upon information and belief, students who had previously been kicked out of CSL for failing to meet its "rigorous" academic standards, were nonetheless allowed by Defendants to immediately re-enroll in CSL the following semester and fork over another $44,284.00 in tuition.

16.     Moreover, the DOE has denied CSL's request for financial aid, thereby forcing many current students to drop out and find a different profession, as it is too late for many to transfer, and too expensive to stay and pay out of their own pockets.  According to CSL, official transcripts will not be given to current students until January 5, 2017.  The spring semester for most law schools beings on January 12, 2017.  Therefore, students looking to go elsewhere to continue their legal education cannot, as CSL has not given students enough notice of its non-compliance with ABA standards.  Had students known of CSL's non-compliance in 2015 when the ABA first announced its findings, students would not be in the terrible situation they are in today.  However, current students reasonably relied upon CSL's substantial misrepresentations, and CLS's public disclosure in November, 2016, came too late for Plaintiffs since they have already taken on hundreds of thousands of dollars in non-dischargeable debt.

17.     Accordingly, Plaintiffs now seek to vindicate their interests through the judicial system.  This action asserts the following claims: Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Fraud; Constructive Fraud; Intentional Misrepresentation; Negligent Misrepresentation; Unjust Enrichment; Unconscionability; Breach of Fiduciary

---

[4] As the Defendants have yet to issue a public statement to the current students, it is uncertain whether CSL will even continue to operate given its lack of financial aid for its students and its probationary status.

Duties; North Carolina Deceptive Trade Act; Unfair and Deceptive Advertising; Declaratory Judgment; and Punitive Damages, which includes but is not limited to the following: refunding and reimbursing current students for tuition paid to CSL; an order enjoining CSL from continuing to market its false and inaccurate representations regarding its JD program; an order requiring that CSL remain open until such time that current students can retain their JD from CSL if they so choose; costs and expenses, including attorneys' fees, and any additional relief this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the class. Plaintiffs also seek a declaratory judgment that CSL's fraud is a defense to the repayment of the student loans issued by the DOE to plainitffs and the class, that the loans should be discharged, and the any payments made by them are due to be refunded..

## JURISDICTION AND VENUE

18. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of costs and interest.

19. The Court has personal jurisdiction over CSL because CSL has purposefully availed itself of the privilege of conducting business activities in the State of North Carolina. Additionally, CSL has maintained systematic and continuous business contacts with the State of North Carolina, and is registered to conduct business in this State.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants' acts and omissions forming the basis for this action occurred within this District.

9

## THE PARTIES

### I.    PLAINTIFFS

21.    Spencer Krebs is a full-time 3L student at CSL, who currently is the student-body president after being elected so by his peers.  In applying and deciding to enroll at CSL, Mr. Krebs relied upon the advertisements and representations posted on CSL's website and other marketing materials, and specifically relied on CSL's representations that it was in full compliance with each of the ABA's standards, including standards relating to bar passage, job placement, and diversity, and that CSL supplied its students with a rigorous curriculum that was created to ensure that its students are equipped with practical skills that will allow them to thrive in a professional setting.  Based upon these representations, Mr. Krebs has taken on tens of thousands in loans, and until November, 2016, had been under the impression that CSL was fully in compliance with ABA standards.  Had Mr. Krebs been aware that CSL's curriculum, bar passage rates, attrition rates, and admissions process were not in compliance with the ABA, he would have elected to attend a different law school.  Had CSL accurately represented that the ABA announced in 2015 that CSL were not in compliance with ABA standards, Mr. Krebs would have transferred to another law school, or gotten a full-time job to support himself. However, because of CSL's substantial misrepresentations, Mr. Krebs now cannot receive financial aid based upon the DOE's denial, and cannot transfer the majority of his credits, as he is a second-semester 3L.  Not only will the majority of Mr. Krebs' credits not transfer as a result of his 3L status, but the window to transfer is too small, as CSL will not release his official transcripts until one week before the start of the spring semester.  Despite his success, Mr. Krebs now fears that he will not be able to receive a job in the legal field, as a degree from CSL is now worth less than it was represented to be due to CSL's failure to comply with ABA standards.

10

22.     Morgan Switzer is a full-time student 3L student at CSL, who currently is in the top 15% of her class and serves on Law Review.  Like Mr. Krebs, in applying and deciding to enroll at CSL, Ms. Switzer relied upon the advertisements and representations posted on CSL's website and other marketing materials, and specifically relied on CSL's representations that it was in full compliance with each of the ABA's standards, including standards relating to bar passage, job placement, and diversity, and that CSL supplied its students with a rigorous curriculum that was created to ensure that its students are equipped with practical skills that will allow them to thrive in a professional setting.  Based upon these representations, Ms. Switzer has taken on tens of thousands in loans, and until November, 2016, had been under the impression that CSL was fully in compliance with ABA standards.  Had Ms. Switzer been aware that CSL's curriculum, bar passage rates, attrition rates, and admissions process were not in compliance with the ABA, she would have elected to attend a different law school.  Had CSL accurately represented that the ABA announced in 2015 that CSL was not in compliance with ABA standards, Ms. Switzer would have transferred to another law school, or gotten a full-time job to support herself.  However, because of CSL's substantial misrepresentations, Ms. Switzer now cannot receive financial aid based upon the DOE's denial, and cannot transfer the majority of her credits, as she is a second-semester 3L.  Not only will the majority of Ms. Switzer's credits not transfer as a result of her 3L status, but the window to transfer is too small, as CSL will not release her official transcripts until one week before the start of the spring semester.  Despite her success, Ms. Switzer now fears that she will not be able to receive a job in the legal field, as a degree from CSL is now worth less than it was represented to be due to CSL's failure to comply with ABA standards.

23.     Dave Wyatt is a full-time 3L student at CSL, who currently is the co-student leader of an expungement clinic.  Like Mr. Krebs and Ms. Switzer, in applying and deciding to enroll at CSL, Mr. Wyatt relied upon the advertisements and representations posted on CSL's website and other marketing materials, and specifically relied on CSL's representations that it was in full compliance with each of the ABA's standards, including standards relating to bar passage, job placement, and diversity, and that CSL supplied its students with a rigorous curriculum that was created to ensure that its students are equipped with practical skills that will allow them to thrive in a professional setting.  Based upon these representations, Mr. Wyatt has taken on tens of thousands in loans, and until November, 2016, had been under the impression that CSL was fully in compliance with ABA standards.  Had Mr. Wyatt been aware that CSL's curriculum, bar passage rates, attrition rates, and admissions process were not in compliance with the ABA, he would have elected to attend a different law school.  Had CSL accurately represented that the ABA announced in 2015 that CSL was not in compliance with ABA standards, Mr. Wyatt would have transferred to another law school, or gotten a full-time job to support himself.  However, because of CSL's substantial misrepresentations, Mr. Wyatt now cannot receive financial aid based upon the DOE's denial, and cannot transfer the majority of his credits, as he is a second-semester 3L.  Not only will the majority of Mr. Wyatt's credits not transfer as a result of his 3L status, but the window to transfer is too small, as CSL will not release his official transcripts until one week before the start of the spring semester.  Despite his success, Mr. Wyatt now fears that he will not be able to receive a job in the legal field, as a degree from CSL is now worth less than it was represented to be due to CSL's failure to comply with ABA standards.

24.     Chester Roberts is a full-time 3L student at CSL, who has served on moot court. In applying and deciding to enroll at CSL, Mr. Roberts relied upon the advertisements and representations posted on CSL's website and other marketing materials, and specifically relied on CSL's representations that it was in full compliance with each of the ABA's standards, including standards relating to bar passage, job placement, and diversity, and that CSL supplied its students with a rigorous curriculum that was created to ensure that its students are equipped with practical skills that will allow them to thrive in a professional setting.  Based upon these representations, Mr. Roberts has taken on over $100,000 in loans, and until November, 2016, had been under the impression that CSL was fully in compliance with ABA standards.  Had Mr. Roberts been aware that CSL's curriculum, bar passage rates, attrition rates, and admissions process were not in compliance with the ABA, he would have elected to attend a different law school.  Had CSL accurately represented that the ABA announced in 2015 that CSL were not in compliance with ABA standards, Mr. Roberts would have transferred to another law school, or gotten a full-time job to support himself.   However, because of CSL's substantial misrepresentations, Mr. Roberts now cannot receive financial aid based upon the DOE's denial, and cannot transfer the majority of his credits, as he is a second-semester 3L.  Not only will the majority of Mr. Roberts' credits not transfer as a result of his 3L status, but the window to transfer is too small, as CSL will not release his official transcripts until one week before the start of the spring semester.  Despite his success, Mr. Roberts now fears that he will not be able to receive a job in the legal field, as a degree from CSL is now worth less than it was represented to be due to CSL's failure to comply with ABA standards.

## II.     DEFENDANTS

25.     CSL is a private, for-profit law school which was founded in 2006 and

accredited by the ABA is 2011. Upon information and belief, it currently enrolls over 900 students, making it one of the largest law schools in the country, while it has some of the lowest admissions standards for any accredited law school, with a median LSAT score of 142, a median GPA of 2.84, and an acceptance rate of nearly 65 percent of all applicants.

26. InfiLaw is the owner of three for-profit law schools, including the Phoenix School of Law in Phoenix, Arizona and CSL. InfiLaw, in turn, is owned and operated by Sterling Partners, which is a Chicago private equity firm with nearly $4 billion under management and investments in 56 companies across a variety of industries, including education, direct marketing, healthcare, business services and specialty manufacturing and distribution. InfiLaw's current CEO, Rick Inatome, has never graduated from law school and is not a licensed attorney, and has no prior experience operating an education institution. InfiLaw, as the owner of CSL, is therefore liable for the past actions of CSL and the CSL agents and employees including the other named individual Defendants to the Plaintiffs. *See Exhibit E.*

27. The Defendant Jay Conison was formerly the Dean at Valparaiso Law until 2013, where he was found to be non-compliant with ABA standards for admission practices. *See Exhibit C.* In 2013, he became the Dean of CSL while the Plaintiffs attended CSL and was the Dean of CSL when false advertisements and misrepresentations were made regarding the CSL's compliance with ABA standards. Jay Conison was ultimately in charge of the CSL or was involved with the CSL operation and committed the alleged misrepresentations, thereby allowing the CSL's reputation to diminish, Federal Financial Assistance to be denied, and the ABA to place CSL on probation. Despite the ABA's multiple notices that CSL was not in compliance with ABA standards, Jay Conison failed to inform current students of the details. *See 2015 Email*, attached hereto as *Exhibit F.*

14

28.     The Defendant Chidi Ogene, upon information and belief, has been the President at CSL since 2015, when false advertisements and misrepresentations were made regarding the CSL's compliance with ABA standards, and its "rigorous curriculum," admissions process, bar passage rates, and attrition rates.  Despite the ABA's multiple notices that CSL was not in compliance with ABA standards, Chidi Ogene failed to inform current students of the details.

29.     The Defendant Don Lively, upon information and belief, was the President at CSL from 2011-2014, when false advertisements and misrepresentations were made regarding the CSL's compliance with ABA standards and its "rigorous curriculum," admissions process, bar passage rates, and attrition rates.  Despite the ABA's multiple notices that CSL was not in compliance with ABA standards, Don Lively failed to inform current students of the details.

30.     These Defendants knew, as they had been repeatedly advised for years, that the CSL JD program was inadequate.  Yet, armed with this knowledge of inadequacy and pending failure, not only did the Defendants fail to advise the innocent Plaintiffs of the numerous problems with the CSL JD program, which raked in millions of dollars from the innocent and blameless CSL students including the Plaintiffs, but the Defendants handsomely rewarded themselves and those in power at CSL for their incompetence.

31.     Defendant the DOE, is a Cabinet-level department of the United States government.  DOE is the direct lender for student loans issued to plaintiffs and the class under the Direct Loan Program.  DOE is sued in this action only for declaratory relief in the claims set forth in Count XI.

## CLASS ALLEGATIONS

32.     The proposed class consists of all students of CSL who relied upon the Defendants' representations that the JD program was in compliance with ABA and DOE

15

standards. The members of the prospective class are so numerous that joinder of all class members is impractical. Plaintiffs' good faith belief is that there are hundreds of class members, as upon information and belief, CSL currently enrolls over 900 students. The exact number and identities of the class members are currently unknown and can only be ascertained from the books and records of the Defendants and/or appropriate discovery.

33.     Common questions of law and fact exist as to all members of the class that predominate over any questions affecting any individual class members.

34.     Common questions of fact include, but may not be limited to:

     (a)     Did Defendants' fraudulently misrepresent its compliance with ABA and DOE Standards that were known to be false in regards to its educational program, that were used to induce students enroll and/or not transfer to another law school, and that devalued the degrees that current student sought to obtain.

35.     Common questions of law include, but may not be limited to:

     (a)     Do Defendants' actions constitute breach of contract?

     (b)     Were Defendants' representations fraudulent and/or intentional, when it failed to disclose that it had not been in compliance with ABA Standards since 2015, despite being notified?

     (c)     Do Defendants unjustly enrich themselves by enrolling its students through an admission process not in compliance with ABA Standards?

     (d)     Do Defendants' misrepresentations violate the North Carolina Unfair and Deceptive Trade Practice Act?

     (e)     Do Defendants' misrepresentations constitute fraudulent and deceptive advertising?

     (f)     Should Plaintiffs' debt be discharged by DOE based upon its findings that CSL substantially misrepresented its educational program?

36.     Plaintiffs' claims are typical of the claims of the class and Plaintiffs have the same interest as all other members of the class - all have an identical interest to pursue the claims as it relates to Defendants' misrepresentations. The class members allege Defendants violate the North Carolina statutes and breach the agreement between the parties. The class members also allege Defendants have been unjustly enriched as a result of their practices.

37.     Plaintiff will fairly and adequately represent and protect the interest of the class. Plaintiffs are individuals who relied upon Defendants' representations that CSL was in full compliance with ABA Standards, and therefore enrolled and/or did not transfer to another school. Plaintiffs have retained counsel with experience in class action litigation, as well as other complex litigation. The interest of the Plaintiff is coincident to, and not antagonistic to, the interest of other class members.

38.     The questions of law and fact common to members of the class predominant over any questions affecting individual class members. The prosecution of separate actions by individual members of the class would result in duplicitous litigation over the same issues and possibly create a risk of inconsistent or varying adjudications that could result in establishing inconsistent standards of conduct, policies and/or procedures for the Defendants.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because the expense and burdens of individual litigation make it difficult for members of the class to individually seek redress of the wrongs imposed upon them.

40.     The class is readily definable – current CSL students who relied upon CSL's misrepresentations in enrolling in its JD program, but were never informed that CSL was not in compliance with ABA and DOE Standards. Had Plaintiffs known of this, they would have never enrolled in CSL or would have transferred upon being notified. The prosecution of this action

17

as a class action will eliminate the possibility of repetitious litigation. Neither Plaintiffs, nor their, will have difficulty managing their respective roles in prosecuting this action as a class action.

**FACTS**

**A.     VERITABLE "JD FACTORY"**

41.     CSL is a private, for-profit law school which was founded in 2006 and accredited by the ABA in 2011. Upon information and belief, it currently enrolls over 900 students, making it one of the largest law schools in the country, while it has some of the lowest admissions standards for any accredited law school, with a median LSAT score of 142, a median GPA of 2.84, and an acceptance rate of nearly 65 percent of all applicants.

42.     CSL induces many students to enroll by offering nearly every student a $5,000 "academic" scholarship. However, the school fails to disclose that only a minority of these students can possibly retain these scholarships due to CSL's strict grading curve.

43.     For the class of 2017, CSL advertised during the application process that CSL would have a "C" curve only for those students' first year at CSL. Therefore, if a student finished in the middle of his class, he would have a 2.0 GPA. CSL implemented this curve because it was fully aware that a large portion of its admitted students did not have adequate test scores that coincide with success in law school or the bar exam. However, in the year 2015, immediately after being informed that it was not in compliance with ABA standards, CSL created a requirement whereby the class of 2017 would have a "C" curve during their second and third year as well. This was never disclosed to the current students in the class of 2017 during the application process, and was only implemented in order to weed out the students that CSL knew should have never been admitted in the first place, but only CSL took those students'

18

money. The current students who remain at CSL are now graded on a curve they never agreed to when they enrolled at CSL, and are put at a disadvantage when faced against a competitive legal community in search of employment.

44. Despite its lax admission standards, because of CSL's strict grading curve, remaining enrolled in CSL is quite difficult, as the school has, comparatively speaking, lackluster retention rates, and it continues to get worse. For the 2014 academic year, the attrition rate for first-year students was 32.1%. *See Exhibit B*, at 6. In 2015, the attrition rate for first-year students was 44.6%, while it was 49.2% in 2016.[5] *Id.* Indeed, implementing a strict grading curve in order to fail out more students each year seems to be an essential part of CSL's business model, which is to enroll the maximum number of students, regardless of whether they are adequately prepared for law school, all the while retaining millions of dollars in tuition fees.

45. In fact, as further evidence of CSL's profit-motivated practices, upon information and belief, students who had previously failed out of CSL for failing to meet its "rigorous" academic standards, were nonetheless allowed by Defendants to immediately re-enroll in CSL the following semester and fork over another $44,284.00 in tuition.

**B. INFILAW**

46. However, CSL's low admission standards and high attrition rates are not that surprising, considering that it is owned and operated by InfiLaw, a for-profit investment fund that also owns and operates two other law schools, and which, in turn, is owned and operated by Sterling Partners, a Chicago private equity firm with nearly $4 billion under management and investments in 56 companies across a variety of industries, including education, direct marketing, healthcare, business services and specialty manufacturing and distribution. In total, InfiLaw

---

[5] Of the 174 first-year CSL students who attrited as reported for 2016, 130 students (or more than 36% of the entering class) left due to academic attrition. *See Exhibit B*, at 6.

one of 18 education companies that Sterling Partners has invested in, as the investments range

from the online, for-profit college, Ashworth College, to the student tutoring services, Sylvan

Learning Systems and Educate, Inc., to "virtual" charter school operator, Connections Academy,

to the music education service, the School of Rock.

47.     InfiLaw's current CEO is Rick Inatome, a professional entrepreneur who has

never graduated from law school and is not a licensed attorney, and has no prior experience

operating an education institution. The two Sterling Partners who work primarily on the InfiLaw

education fund, Philip Alphonse and Blake Kuhlenschmidt, have never attended law school and

are not licensed attorneys.

## C.     ABA INVESTIGATION AND THE DOE'S FINDINGS OF SUBSTANTIAL MISREPRESENTATION

48.     Since becoming accredited in 2011 by the ABA, CSL has advertised and

represented itself on its website as having the following:

> been awarded full accreditation" by the ABA in 2011, which
> required the school "ha[ve] full compliance with each of the
> ABA's standards, including standards relating to bar passage, job
> placement and diversity
> . . .
> a rigorous curriculum [that] has been created to ensure that our
> students are equipped with practical skills that will allow them to
> thrive in a professional setting. Students are taught not only the
> traditions and theory of law, but also how to apply this learning
> through critical thinking and analytical skill sets. We address what
> using a law degree in "real life" can mean to an individual both
> personally and professionally."

*See Exhibit A.*

49.     Between March 16 and 19, 2014, an ABA "site team" conducted an on-site

Three-Year Interval evaluation of CSL. During the course of this site visit, the team met with

Rick Inatome (CEO of InfiLaw), Jay Conison (Dean of CSL), Don Lively (then-President of

CSL), numerous CSL administrators, members of the institution's accreditation self-study Committee, CSL faculty, CSL staff, and CSL students. Members of the site team also visited a significant majority of the classes taught during its visit. *See Exhibit B*, at 3.

50. On September 15, 2014, the ABA provided CSL with a 72-page Inspection Report and invited the school to provide comments and note factual errors. *Id.* The ABA informed CSL that the Report would provide the basis for its determination on whether CSL's programs were operating in compliance with the ABA Standards. Among its topics, the Report discussed CSL's program of legal education, students (including both admissions qualifications and output metrics, including a discussion of bar passage statistics), and financial operations. *Id.* In October 2014, CSL responded in writing to the Report. *Id.*

51. At its January 2015 meeting, the ABA reviewed both the Report and CSL's written response. *Id.* Following that meeting, the Committee issued its first decision announcing that it had "reason to believe" that CSL had "not demonstrated compliance" with certain ABA standards. *Id.* The ABA also "request[ed] additional information to make a determination" as to CSL's compliance with additional standards and interpretations, including Standards 301(a), 501(a), and 501(b), and Interpretation 501-1, which are foundational to the educational enterprise and the nature of the educational program offered by CSL. Those standards are as follows:

> Standard 301(a): "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession."

> Standard 501(a): "A law school shall maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."

> Standard 501(b): "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

21

Interpretation 501-1: "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

*Id.* at 4.

52.     Jay Conison, the Dean at CSL at this time, misrepresented the ABA's decision, and emailed all current students at CSL stating the following:

the report of the site visit team was very positive. The letter is also very positive and contains only a few items on which we need to report back with updated information.  Requests to report back are normal.  I previously served in the role of Chair of the ABA Accreditation Committee and in my experience decision letters typically contain more requests to report back than does ours."

*See Exhibit F.*

53.     Relying on their Jay Conison's representations, current students at that time felt no need to panic or seek admission elsewhere, as Jay Conison made it appear as if the ABA had not just informed him that it had "reason to believe" that CSL had "not demonstrated compliance" with certain ABA standards. *See Exhibit B*, at 3.

54.     On February 3, 2016, the ABA issued its second decision regarding CSL.  In this decision, the ABA made twenty factual findings, thirteen of which pertained to the Committee's request for additional information to determine CSL's compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. *See Exhibit B*, at 4.  The ABA concluded that CSL was "not in compliance" with other standards, specifically with: Standards 301(a), 501(a), 501(b), and Interpretation 501-1, in that the Law School has not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal

22

profession; maintaining sound admissions policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education; or is admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar. *Id.*

55. In July 2016, the ABA issued its third decision, again finding CSL to be out of compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. In this decision, the ABA also announced its conclusion that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 *are substantial and have been persistent.*" *Id.* at 5. The ABA also found that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." *Id.* Among its factual findings, the ABA concluded:

> With respect to CSL's admissions policies, [i]t was not clear to the [ABA] how [CSL's] admission practices demonstrate that applicants with low academic and admission test credentials appear capable of completing the Law School's program of legal education and being admitted to the bar.
> . . .
> Attrition is substantial and suggests that the Law School's admissions process is not as predictive of academic success as it might be.
> . . .
> The Law School's bar passage rates … remain low, often significantly so.
> . . .
> The Law School's ultimate bar passage rates were in compliance for 2011, 2012, and 2013. The school may be in compliance for 2014, but the 17% missing or never passed could affect that compliance. It is not in compliance for 2015 at this point, with 43% either missing or never [having] passed the bar.

*See Exhibit B*, at 6.

56. In August 2016, CSL appealed aspects of the ABA's third decision, and on October 21, 2016, the ABA held a hearing at which Jay Conison testified on CSL's behalf. At

that hearing, Jay Conison testified that CSL is "not appealing that conclusion of noncompliance with Standards 301 and 501," despite the school's "disappointment" with the conclusion. *See Exhibit B*, at 7.

57. On November 14, 2016, the ABA issued its fourth decision informing CSL that that it was "not in compliance" with Standards 301(a), 501(a), and 501(b), that the issues of noncompliance with these standards "are substantial and have been persistent," and that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." The ABA then ordered remedial actions, including public disclosure, and placed CSL on probation, effective November 14, 2016. *Id.* at 7-8.

58. Therefore, in the aftermath of the ABA's issuance of probation, it is clear that in January 2015, the ABA announced that CSL had not demonstrated it was in compliance with ABA standards, and in February 2016, July 2016, and November 2016, the ABA announced its determination that CSL was out of compliance with ABA Standards 301(a), 501(a), and 501(b), and Interpretation 501-1. *Id.* at 8. CSL has conceded the noncompliance findings and certain remedial requirements. *Id.*

59. After reviewing the ABA's findings, the DOE denied CSL's Recertification Application to Participate in the Federal Student Financial Assistance Programs. *See Exhibit B*. In making this denial, the DOE considered:

> the particular accreditation standards that CSL was found to be noncompliant with, the nature of those standards, the fact that the ABA found the noncompliance to be both substantial and persistent, the fact that the ABA found CSL's plans for bringing itself into compliance with the Standards have not proven effective or reliable, the fact that ABA believed the noncompliance to be so severe as to merit placing the institution on probation, corroborative evidence of the noncompliance, and the institution's administrative capability and fiduciary conduct.

24

*See Exhibit B*, at 8.

60.    The DOE found that CSL *substantially misrepresented* to students and prospective students the "nature and extent" of CSL's accreditation and the "appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet." *Id.* at 10.  Moreover, the DOE found substantial misrepresentation on the part of CSL, as prior to the ABA's November 2016 announcement, the DOE was unaware of *any public statements* that would have informed a student or prospective student that the ABA had found the school to be out of compliance with the Standards, or that the ABA had determined that CSL had "not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." *Id.*  Nor was the DOE aware of any statement or disclosure during that period by CSL that the ABA had determined that the school was "admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar." *Id.*

61.    The DOE stated that CSL's misrepresentations on its website that it was in full compliance with the ABA could lead a current or prospective student to "conclude that the 2011 finding of 'full compliance' by the ABA was the final word as to the institution's compliance with the ABA's accreditation standards." *Id.* at 11.  These representations were misleading insofar as they had the likelihood or tendency to deceive reasonable students and prospective students about the current status, nature, and extent of CSL's accreditation. *Id.*

62.    Moreover, the DOE found that CSL's representations that it created a "rigorous curriculum . . . to ensure that [CSL] students are equipped with practical skills that will allow them to thrive in a professional setting," is misleading, as:

(1) the ABA has specifically and repeatedly concluded that CSL has not maintained a "rigorous" program of legal education, that its failures in this regard are "substantial" and "persistent," and that CSL's plans to come into compliance with that standard have not proven effective or reliable; and (2) the positioning of CSL's description of its curriculum as "rigorous" directly beneath the discussion of compliance with the ABA standards (which use the word "rigorous" to describe what is expected of a compliant program) has the likelihood or tendency to leave students and prospective students with the false impression that CSL was compliant with that very requirement by the ABA.

*Id.*

63.    Each of these misleading statements constitutes a substantial misrepresentation because students and prospective students could reasonably be expected to rely on each of these statements to their detriment. *Id.*   Indeed, CSL argued to the ABA that if students and prospective students were aware of the ABA's findings of noncompliance, that would have a "profound impact on admissions" because: (1) knowledge of the ABA's findings would make applicants "much less likely to enroll;" and (2) such a disclosure would "effectively tell applicants to beware of attending the Charlotte School of Law." *Id.* at 12. In addition, CSL argued to the ABA that public disclosure of its noncompliance would "have an adverse impact on [CSL's] ability to retain high-performing students," because it would "inevitably create anxiety on the part of high-performing students and make their transfer more likely." *Id.* Thus, under CSL's own arguments, the truth about its noncompliance would have impacted the decisions made by prospective students and current students to either enroll or continue their studies at CSL. *Id.*

64.    As part of CSL's appeal to the ABA, the ABA provided a market study that tested the impact of disclosure on CSL applicants. *Id.*  The study analyzed the views of individuals with LSAT scores above 142 who had applied to one or more of the InfiLaw schools. *Id.*   These

individuals were asked to assess the impact on the likelihood of their respective enrollment at a particular law school if acceptance materials from that school included a statement that the *school failed to meet accreditation standards dealing with admissions, educational programs, and bar passage. The study concluded that approximately 3 in 4 applicants (or 74%) stated that they would be "much less likely to enroll" after reading such a statement* – establishing that reasonable students were highly likely to rely on the disclosure of information regarding the accreditation failures that CSL sought to keep from public view. *Id.*

65. Finally, the DOE found that CSL substantially misrepresented the bar passage rates of CSL graduates in an interview it had with the Charlotte Business Journal published on November 30, 2016.[6]  In that interview, Defendant Chidi Ogene stated that "[i]f you look at bar pass rates between 2009 and 2013, we were consistently at or above the state bar average pass rate.  That is an incredible feat for a new school." *Id.*  However, bar passage data published on CSL's website shows that, out of the nine sittings of the North Carolina bar exam (between July 2009 and July 2013), CSL's first-time bar passage rate was actually below the state average five times (with a maximum differential of -13.33%) and above the state average only four times (with a maximum differential of 7.4%).[7] Thus, CSL's statement was false and/or misleading, particularly when the law school president responded to questions about an accreditor's finding of the school's substantial and persistent failures to prepare students for admission to the bar. *Id.*

66. Substantial misrepresentations about the success that CSL graduates have on bar examinations constitute substantial misrepresentations about both the "appropriateness of [CSL's] courses and programs to the employment objects that [CSL] states its programs are designed to meet."  CSL either knew or reasonably should have known that the interview was to

---

[6] Jennifer Thomas, *Charlotte School of Law president talks probation, considers nonprofit status*, CHARLOTTE BUS. J., Nov. 30, 2016 available at 2016 WLNR 36711693 (Nov. 30, 2016).
[7] Bar passage data published at: http://www.charlottelaw.edu/gainful-employment-aba-required-disclosures.html.

be made public and could be viewed by current or prospective students. *Id.* at 13. Because a reasonable student or prospective student would have understood CSL's comments to be misleading in its representation of CSL graduates' prior success on the bar examination, these statements constituted substantial misrepresentations.

67.     Therefore, CSL, in conspiracy with the other named Defendants, knowingly advertised and represented false claims and statements as to the viability and credibility of CSL's JD program in order to obtain and keep the Plaintiffs' property.  CSL and the other conspiring Defendants, by enrolling the Plaintiffs at CSL into a false and misrepresented JD program, took millions of dollars from the Plaintiffs, which now will be even more difficult to pay back as CSL in on probation, thereby lessening the worth of current students' *potential* degree.  Moreover, the DOE has denied CSL's request for financial aid, thereby forcing many current students to drop out and find a different profession, as it is too late for many to transfer, and too expensive to stay and pay out of their own pockets.

68.     Accordingly, Plaintiffs now seek to vindicate their interests through the judicial system. This action asserts the following claims: Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Fraud; Constructive Fraud; Intentional Misrepresentation; Negligent Misrepresentation; Unjust Enrichment; Unconscionability; Breach of Fiduciary Duties; North Carolina Deceptive Trade Act; Fraudulent and Deceptive Advertising; Declaratory Judgment and Punitive Damages, which includes but is not limited to the following: refunding and reimbursing current students for tuition paid to CSL; an order enjoining CSL from continuing to market its false and inaccurate representations regarding its JD program; an order requiring that CSL remain open until such time that current students can retain their JD from CSL if they so choose; costs and expenses, including attorneys' fees, and any additional relief

this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the class.

## COUNT I
## Breach of Contract
## (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

69.     The Plaintiffs entered into a contract with the Defendants, the provisions of which were expressed or implied, in which the Defendants agreed to provide the Plaintiffs, inter alia, with a JD program fully compliant with each ABA Standard, including "a rigorous curriculum [that] has been created to ensure that our students are equipped with practical skills that will allow them to thrive in a professional setting." *See Exhibit A*.

70.     The Defendants' failure to fulfill its contractual obligation as set forth above and as represented and promised to the Plaintiffs constitutes a breach of the contract by the Defendants.

71.     The express and implied contracts between Plaintiffs and Defendants were valid and binding at the time of Defendants' breach.

72.     As a result of the breach of contract by the Defendants, by and through their officers, directors, employees, agents, and servants, as set forth above, the Plaintiffs have suffered and will continue to suffer monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain, inconvenience, mental anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation.

73.     The nature of this case cannot be cured.  In notice of caution, Plaintiffs have attached a Notice of Breach of Contract, attached hereto as *Exhibit G*.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

74.     The Defendants had a duty to act in good faith in the performance of the contract that existed between it and the Plaintiffs.

75.     By failing to provide the educational opportunity promised, making false misrepresentations and omitting material facts, the Defendants breached their duty of good faith.

76.     As a result of the conduct of the Defendants, by and through its officers, directors, employees, agents, and servants, as set forth above, the Plaintiffs have suffered and will continue to suffer monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain, inconvenience, mental anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation.

## COUNT III
### Fraud
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

77.     The Defendants, by and through their officers, directors, employees, agents, and servants, represented to the Plaintiffs:

> (a)     That the Plaintiffs were attending a JD Program that was in full compliance with the ABA Standards;

> (b)     That Plaintiffs would receive a rigorous curriculum that had been created to ensure that Plaintiffs would be equipped with practical skills that would allow them to thrive in a professional setting;

<blockquote>
(c)     That the Plaintiffs would be eligible to receive financial aid in order to complete the CSL JD program;

(d)     That CSL's bar passage rates were consistently at or above the state bar average pass rate;

(e)     That the Plaintiffs would be graded on a "C" curve for only their first year, rather than the entire duration of their enrollment.
</blockquote>

78.    After the Defendants were informed of CSL's failure to demonstrate its compliance with ABA standards in 2015, they concealed this fact from the Plaintiffs. The Defendants at this time further concealed from the Plaintiffs the information it received from the ABA in 2015 and throughout 2016 until it was force by the ABA to make a public disclosure. But for the ABA's demand, there is no guarantee that CSL would have said anything to its students to this day.

79.    Once the Plaintiffs became aware of the ABA's findings in 2015, Defendants with knowledge concealed the severity of the matter from the Plaintiffs by failing to make any public disclosure as to the details of the ABA's findings. *See Exhibit F.* Moreover, once Plaintiffs became aware of DOE's denial of CSL's request for financial assistance, Defendants with knowledge concealed the severity of the matter from the Plaintiffs by locking the seventh floor doors at CSL and cutting off the elevator access to the seventh floor, thereby leaving current students without any answers. Defendants have not released current students' official transcripts in order to allow them to transfer, and have not made any statement so as to shed light to the lack of financial aid.

80.    There have been no public statements by the Defendants that would have informed a student or prospective student that the ABA had found the school to be out of compliance with ABA Standards, or that the ABA had determined that CSL had "not

demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." *See Exhibit B*, at 10. Nor was there any statement or disclosure during that period by CSL that the ABA had determined that the school was "admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

81.     Based upon these representations and concealment of material facts, the Plaintiffs enrolled in and/or continued their enrollment in JD program at Defendant CSL. The Plaintiffs paid tuition, expenses and fees, and further lost opportunities to transfer when they remained at Defendant CSL. The representations and omissions of the Defendants, its officers, directors, employees, agents, servants and trustees, were false and concerned material facts.

82.     These representations and omissions were made either negligently or intentionally and knowingly by Defendants and their officers, directors, employees, agents, and servants, with the intent to mislead the Plaintiffs, to prevent the Plaintiffs from transferring to a law school not on probation from which the Plaintiffs could receive financial aid, and to assure the Plaintiffs paid additional tuition, fees and expenses to CSL while the Plaintiffs remained in the CSL JD program.

83.     The Plaintiffs relied upon these statements and omissions of material facts and have suffered damages as result of that reliance the Plaintiffs have invested their time and money into the CSL JD program, have incurred loan obligations which will need to be repaid, have lost the opportunity to transfer to a law school not on probation from which the Plaintiffs could receive financial aid, and will incur additional tuition, fees and expenses if the Plaintiffs are

required to complete their JD education at another institution, as most current students will not have their full amount of credits transfer, thereby requiring the students to retake certain classes.

84. As a result of the acts of the Defendants, by and through their officers, directors, employees, agents, and servants, as set forth above, the Plaintiffs have suffered and will continue to suffer monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain, inconvenience, mental anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation.

## COUNT IV
## Constructive Fraud
## (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

85. The Defendants, by and through their officers, directors, employees, agents, and servants, represented to the Plaintiffs:

    (a)    That the Plaintiffs were attending a JD Program that was in full compliance with the ABA Standards;

    (b)    That Plaintiffs would receive a rigorous curriculum that had been created to ensure that Plaintiffs would be equipped with practical skills that would allow them to thrive in a professional setting;

    (c)    That the Plaintiffs would be eligible to receive financial aid in order to complete the CSL JD program;

    (d)    That CSL's bar passage rates were consistently at or above the state bar average pass rate;

    (e)    That the Plaintiffs would be graded on a "C" curve for only their first year, rather than the entire duration of their enrollment.

86. After the Defendants were informed of CSL's failure to demonstrate its compliance with ABA standards in 2015, they concealed this fact from the Plaintiffs. The

Defendants at this time further concealed from the Plaintiffs the information it received from the ABA in 2015 and throughout 2016 until it was forced by the ABA to make a public disclosure. But for the ABA's demand, there is no guarantee that CSL would have said anything to its students to this day.

87.     Once the Plaintiffs became aware of the ABA's findings in 2015, Defendants with knowledge concealed the severity of the matter from the Plaintiffs by failing to make any public disclosure as to the details of the ABA's findings. *See Exhibit F*.   Moreover, once Plaintiffs became aware of DOE's denial of CSL's request for financial assistance, Defendants with knowledge concealed the severity of the matter from the Plaintiffs by locking the seventh floor doors at CSL and cutting off the elevator access to the seventh floor, thereby leaving current students without any answers.  Defendants have not released current students' official transcripts in order to allow them to transfer, and have not made any statement so as to shed light to the lack of financial aid.

88.     There have been no public statements by the Defendants that would have informed a student or prospective student that the ABA had found the school to be out of compliance with ABA Standards, or that the ABA had determined that CSL had "not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." *See Exhibit B*, at 10.  Nor was there any statement or disclosure during that period by CSL that the ABA had determined that the school was "admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar." *Id.*

89.     Based upon these representations and concealment of material facts, the Plaintiffs enrolled in and/or continued their enrollment in JD program at Defendant CSL.  The Plaintiffs paid tuition, expenses and fees, and further lost opportunities to transfer when they remained at Defendant CSL. The representations and omissions of the Defendants, its officers, directors, employees, agents, servants and trustees, were false and concerned material facts.

90.     These representations and omissions were made either negligently or intentionally and knowingly by Defendants and their officers, directors, employees, agents, and servants, with the intent to mislead the Plaintiffs, to prevent the Plaintiffs from transferring to a law school not on probation from which the Plaintiffs could receive financial aid, and to assure the Plaintiffs paid additional tuition, fees, and expenses to CSL while the Plaintiffs remained in the CSL JD program.

91.     The Plaintiffs relied upon these statements and omissions of material facts and have suffered damages. As a result of that reliance, the Plaintiffs have invested their time and money into the CSL JD program, have incurred loan obligations which will need to be repaid, have lost the opportunity to transfer to a law school not on probation from which the Plaintiffs could receive financial aid, and will incur additional tuition, fees and expenses if the Plaintiffs are required to complete their JD education at another institution, as most current students will not have their full amount of credits transfer, thereby requiring the students to retake certain classes.

92.     As a result of the acts of the Defendants, by and through their officers, directors, employees, agents, and servants, as set forth above, the Plaintiffs have suffered and will continue to suffer monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain,

inconvenience, mental anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation.

## COUNT V
### Intentional Misrepresentation
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows

93.     The Defendants repeatedly misrepresented to the Plaintiffs the status of its program and its ability to provide services it promised as part of the CSL JD program.

94.     The Defendants' misrepresentations were made intentionally, fraudulently, and with reckless disregard for their truth or falsity.

95.     The Defendants deliberately misled the Plaintiffs to induce them to enroll in and/or continue their enrollment in its program and pay tuition for the CSL JD program.

96.     The Defendants' intentional misrepresentations were material representations upon which the Plaintiffs reasonably relied upon in enrolling in, and/or continuing their enrollment in its program, thereby causing students to assume student loans and incur other out-of-pocket expenses.

97.     As a result of the acts of the intentional misrepresentations of Defendants as set forth above, the Plaintiffs have suffered and will continue to suffer monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain, inconvenience, mental anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation.

## COUNT VI
### Negligent Misrepresentation
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

36

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

98.     The Defendants had a duty to provide accurate information to the Plaintiffs regarding the status of the CSL JD program when it solicited the Plaintiffs to enroll and/or continue their enrollment at CSL.

99.     The Defendants knew, or reasonably should have known, that the Plaintiffs were relying upon the representations of the Defendants as to the status of its JD program and Defendants' ability to provide the educational opportunity promised.

100.    The Defendants failed to exercise ordinary care and failed to act in accordance with the standard of governing board of education institutions in making representations to the Plaintiffs and/or omitting material facts to the Plaintiffs. As a result of the negligent misrepresentations of the Defendants as set forth above, the Plaintiffs have suffered and will continue to suffer monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain, inconvenience, mental anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation.

## COUNT VII
### Unjust Enrichment
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

101.    All of the Defendants have been and are being unjustly enriched as a result of the wrongful conduct of the Defendants as aforesaid.

## COUNT VIII
### Unconscionability
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

102.    Given the misrepresentations made, the omission of material facts, and the failure to provide the promised educational opportunity, the amount paid by the Plaintiffs to the Defendants was unconscionable as a matter of law.

**COUNT IX**
**Breach of Fiduciary Duties**
**(AS TO ALL DEFENDANTS OTHER THAN DOE)**

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

103.    All of the Defendants owed and continue to owe fiduciary duties to the Plaintiffs as students enrolled in its JD program.

104.    The Defendants' duties include, but are not limited to, providing timely, accurate, truthful and complete information to the Plaintiffs concerning the compliance status of the CSL JD program, and assisting them afterwards, in light of the Defendants' actions.

105.    The duties owed by the Defendants to the Plaintiffs also include treating the Plaintiffs' interests with at least the same respect and weight as the Defendants gave to Defendants' own interests.

106.    The Defendants chose not to provide timely, accurate, truthful and/or complete information to the Plaintiffs concerning its compliance with ABA standards, chose to place and treat its own financial and other interests with greater weight than it treated the Plaintiffs, and otherwise chose to ignore, minimize and breach the fiduciary duties the Defendants owed to the Plaintiffs.

107.    As a result of the breach of its fiduciary duties owed to the Plaintiffs by the Defendants as set forth above, the Plaintiffs have suffered and will continue to suffer monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain, inconvenience, mental

anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation.

## COUNT X
### North Carolina Unfair and Deceptive Trade Practice Act
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

108.    The Defendants' wrongful acts, misrepresentations and omissions violate and are prohibited by the North Carolina Unfair and Deceptive Trade Practice Act, N.C. Gen. Stat. § 75-1.1, et seq.

109.    The Defendants' representations that its curriculum, attrition rates, bar passage rates, and admissions process were in compliance with ABA standards was unfair, as it was unethical, unscrupulous, and had a tendency to deceive.

110.    Defendants' deception and misrepresentations were in and/or affecting commerce, as Plaintiffs have taken out millions in student loans in reliance upon Defendants' representations.  Pursuant to the North Carolina Deceptive Trade Act, the Plaintiffs seek relief for the Defendants' violations of this State law and a refund of the tuition, books, and fees paid by the Plaintiffs to CSL.

111.    The unfair conduct of Defendants as set forth in this cause of action and elsewhere in the Complaint, and as will be further determined through discovery and proven at trial, was the proximate cause of the monetary loss, loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for career advancement, significant debt, emotional pain, inconvenience, mental anguish, interference with family relationships, personal embarrassment, humiliation, loss of enjoyment of life, and loss of professional reputation to Plaintiffs.

39

112.    Upon information and belief, the acts or practices of Defendants were willful in nature, in violation of N.C.G.S. § 75-1.1, et seq..

113.    Pursuant to N.C.G.S. § 75-16, Plaintiffs are further entitled to the trebling of the damages caused by the unfair and/or deceptive conduct of Defendants.

114.    Defendants willfully engaged in the acts and practices complained of in this Action, and have made an unwarranted refusal to fully resolve the matter prior to litigation. Therefore, pursuant to N.C.G.S. § 75-16.1, Plaintiffs are further entitled to all costs of litigation, including attorneys' fees, as a result of such willful unfair and/or deceptive conduct by Defendants.

### COUNT XI
### Fraudulent and Deceptive Advertising
### (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

115.    The Defendants' wrongful acts, misrepresentations, and omissions violate and are prohibited by the, as Defendants intended to induce current and prospective students to enroll in the CSL program and/or not transfer to another law school, as it made, published, disseminated, circulated and/or placed before the public in the State of North Carolina, advertisements containing assertions, representations, or statements of fact which were untrue, deceptive, or misleading.

116.    Defendants willfully advertised it was in compliance with ABA standards with intent to mislead prospective and current students. All of the Defendants' acts were within the conspiratorial intent to obtain and keep money from the Plaintiffs.

117.    As a result of the Defendants' intentionally deceptive and fraudulent advertisements and representations as set forth above, the Plaintiffs have suffered an

ascertainable loss of money. Pursuant to N.C. Gen. Stat. § 14-117, the Plaintiffs seek relief for the Defendants' violations of this State law and a refund of the tuition, books, and fees paid by the Plaintiffs to CSL.

**COUNT XI**
**Declaratory Judgment**
**(AS TO ALL DEFENDANTS)**

The Plaintiffs reassert and reallege the allegations above and in addition state as follows:

118.    Plaintiffs seek a declaratory judgment for Defendant DOE to discharge all of Plaintiffs' debt that was acquired in order to attend CSL's JD program.

119.    The DOE advertises a defense to repayment discharge of the federal Direct Loans taken out by student in order to attend a school if that school committed fraud by doing something or failing to do something, misrepresented its services, or otherwise violated applicable state law related to students' loans or the educational services they paid for. The DOE will acknowledge a borrower's claim under state law as a defense to repayment of a loan only if the cause of action directly relates to the loan or to the school's provision of educational services for which the loan was provide.

120.    The DOE has already found that other Defendants, including CSL, substantially misrepresented the nature of its educational program, as outlined in *Exhibit B*.

121.    Plaintiffs took out massive amounts of debt in order to attend CSL, which represented that its educational program was in full compliance with the ABA, although it was not. *See Exhibit B*.  CSL's substantial misrepresentations are grounds for Plaintiffs' debt acquired in order to attend CSL to be discharged by the DOE.

122.    Therefore, because CSL substantially misrepresented its JD program, and those misrepresentations were the reason Plaintiffs acquired such debt, Plaintiffs seek a declaratory

41

judgment that CSL's fraud is a defense to the repayment of the student loans issued by the DOE to Plaintiffs and the class, that the loans should be discharged, and the any payments made by them are due to be refunded..

## COUNT XII
## Punitive Damages
## (AS TO ALL DEFENDANTS OTHER THAN DOE)

The Plaintiffs reassert and reallege the allegations above and in addition state as follows

123.    The actions of the Defendants were reckless, willful, wanton, grossly negligent. and in total disregard for the civil rights of the Plaintiffs.

124.    The wrongful conduct of the Defendants as aforesaid is sufficiently reprehensible to warrant the imposition of punitive damages in an amount sufficient to deter or prevent similar conduct in the future.

125.    As a direct and proximate result of the wrongful conduct of the Defendants as set forth above of the Complaint, the Plaintiffs has suffered damages including, but not limited to, the following:

(a)    Specific economic losses including the payment of tuition, indebtedness and other out-of-pocket expenses incurred by the Plaintiffs in their attempt to complete their education as promised by the Defendants;

(b)    Aggravation, annoyance, inconvenience, emotional pain, mental anguish, personal embarrassment, humiliation, interference with family relationships, loss of enjoyment of life and emotional distress;

(c)    Loss of educational opportunities;

(d)    Lost wages;

(e)    Loss of future earning capacity and income;

(f)    Loss of employment opportunities;

(g)    Loss of opportunities for career advancement;

(h)     Loss of professional reputation;

(i)     Monetary expenses incurred in an attempt to mitigate damages; and,

(j)     Attorney fees and costs incurred in persecuting this action.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against the Defendants, in favor of the Plaintiffs for compensatory and punitive damages with both prejudgment and post judgment interest calculated at the current legal rate. The Plaintiffs request any such other relief deemed appropriate and just by this Court.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

SPENCER KREBS, MORGAN SWITZER,
DAVE WYATT, and CHESTER ROBERTS
By Counsel

/s/ Noah B. Abrams
Noah B. Abrams
NC State Bar 38735
Co-Counsel for Plaintiffs
Abrams & Abrams, P.A.
1526 Glenwood Ave.
Raleigh, NC 27608
Phone: 919-755-9166
Fax: 919-755-9396
nabrams@abramslawfirm.com

Timothy C. Bailey
WV State Bar 5839
D. Blake Carter, Jr.
WV State Bar 9970
Taylor M. Norman
WV State Bar 13026
Co-Counsel for Plaintiffs
Bailey, Javins & Carter, LC
213 Hale Street
Charleston, WV 25301
Phone: 304-345-0346
Fax: 304-345-0375

Anthony J. Majestro
WV State Bar 5165
J.C. Powell
WV State Bar 2957
Co-Counsel for Plaintiffs
Powell & Majestro P.L.L.C
405 Capitol Street, Suite P-1200
Charleston, WV   25301
Phone: 304-346-2889
Fax: 304-346-2895