| | | |
|---|---|---|
| SPENCER KREBS | ) | |
| MORGAN SWITZER | ) | |
| DAVE WYATT | ) | |
| KRYSTAL HORSLEY | ) | |
| JACENTA MARIE PRICE | ) | |
| MARKISHA DOBSON, | ) | |
| ON BEHALF OF THEMSELVES AND | ) | |
| ALL OTHERS SIMILARLY SITUATED, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| CHARLOTTE SCHOOL OF LAW, LLC | ) | |
| INFILAW CORPORATION | ) | |
| INFILAW HOLDING, LLC | ) | |
| JAY CONISON | ) | |
| CHIDI OGENE | ) | |
| DON LIVELY | ) | |
| BETSY DEVOS, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

This matter is before the Court upon Defendants Charlotte School of Law., LLC, Infilaw

Corporation, Infilaw Holding, LLC,[1] Jay Conison, Chidi Ogene, and Don Lively's (the "CSL

Defendants") Motion to Dismiss for failure to state a claim upon which relief can be granted

---

[1] Defendants InfiLaw Holding, LLC and Don Lively have also moved to dismiss for lack of personal jurisdiction. In an Order dated June 22, 2017, the Court allowed the Plaintiffs to conduct limited discovery as to the issue of personal jurisdiction over these two Defendants. Such discovery is ongoing and will be completed by September 6. The Sterling Partners Defendants were dismissed for lack of personal jurisdiction on July 27, 2017.

1

(Doc. No. 65), as well as Defendant United States Department of Education's ("DOE")[2] Motion

to Dismiss for lack of subject matter jurisdiction. (Doc. No. 67)  Plaintiffs have filed a response

in opposition and Defendants have filed a Reply.  Accordingly, this matter is ripe for disposition.

I.      **FACTUAL BACKGROUND**

This action is one of several filed against Charlotte School of Law, LLC ("CSL"), its

parent corporation, and others after CSL was placed on probation by the American Bar

Association ("ABA") in November of 2016 and CSL's access to federal student loan programs

was revoked by the DOE in December of 2016.

CSL is one of three for-profit law schools owned by InfiLaw Corporation and/or

InfiLaw Holding, LLC (collectively InfiLaw) ("InfiLaw").  CSL was founded in 2006

and granted full ABA accreditation in 2011. (Second Amended Complaint ("SAC") ¶¶ 2,

4, 56).  Since becoming accredited, CSL has advertised and represented itself on its

website as having "been awarded full accreditation" by the ABA in 2011, which required

the school "ha[ve] full compliance with each of the ABA's standards, including standards

relating to bar passage, job placement and diversity." (*Id*. at ¶ 63, Exhibit A).  Moreover,

the website stated that:

> a rigorous curriculum has been created to ensure that our students are equipped with
> practical skills that will allow them to thrive in a professional setting. Students are
> taught not only the traditions and theory of law, but also how to apply this learning
> through critical thinking and analytical skill sets. We address what using a law
> degree in 'real life' can mean to an individual both personally and professionally.

*Id*.

---

[2] Pursuant to an unopposed motion to substitute party, Betsy DeVos, in her official capacity as Secretary of the
DOE, was substituted in place of Defendant DOE.

2

Between March 16 and 19, 2014, an ABA "site team" conducted an on-site Three-Year Interval evaluation of CSL. During the course of this site visit, the team met with Rick Inatome (CEO of InfiLaw), Jay Conison (Dean of CSL), Don Lively (then-President of CSL), numerous CSL administrators, members of the institution's accreditation self-study committee, CSL faculty, CSL staff, and CSL students. (*Id*. at ¶ 64, Exhibit B, at 3).

Subsequent to the site visit, and following a January 2015 meeting, the ABA informed CSL that it "had not demonstrated compliance with certain ABA standards." (*Id*. at ¶¶ 7, 66). The ABA also "request[ed] additional information to make a determination" as to CSL's compliance with additional standards and interpretations, including Standards 301(a),[3] 501(a),[4] and 501(b),[5] and Interpretation 501-1,[6] which are foundational to the educational enterprise and the nature of the educational program offered by CSL. (*Id*. at ¶ 66, Exhibit B, at 3). Despite being aware of this, CSL failed to inform students or prospective students that the ABA had found the school to be out of compliance with ABA Standards. (*Id*. at ¶ 7, Exhibit B, at 10). In fact, Jay Conison, the Dean of CSL at this time, instead emailed all current students at CSL stating the following:

> the report of the site visit team was very positive. The letter is also very positive and contains only a few items on which we need to report back with updated information. Requests to report back are normal. I previously served in the role of Chair of the ABA Accreditation Committee and in my experience decision letters typically contain more requests to report back than does ours.

---

[3] Standard 301(a): "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical and responsible participation as members of the legal profession."

[4] Standard 501(a): "A law school shall maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."

[5] Standard 501(b): "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

[6] Interpretation 501-1: "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

3

(*Id.* at ¶ 67, Exhibit F).

On February 3, 2016, the ABA informed CSL that CSL "was not in compliance" with other ABA standards, specifically with:

> Standards 301(a), 501(a), 501(b), and Interpretation 501-1, in that the Law School has not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession; maintaining sound admissions policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education; or is admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.

(*Id.* at ¶¶ 8, 69, Exhibit B, at 4).  However, despite being fully aware of the ABA's second announcement on February 3, 2016, CSL failed to inform students and prospective students about the status of its ABA accreditation. (*Id.* at ¶¶ 9, 70, Exhibit B, at 11).

In July 2016, the ABA issued its third decision, again finding CSL to be out of compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. In this decision, the ABA also informed CSL in its conclusion that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 are substantial and have been persistent." (*Id.* at ¶¶ 11, 71, Exhibit B, at 5).  The Committee also found that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." *Id.* The decision was expressly based on forty-four factual findings, on topics such as admissions, programming for admitted students, mentoring and related opportunities, the writing program, academic support, faculty, summer and intersession changes, attrition, bar preparation during law school, post-graduation bar preparation, and bar examinations. *Id.*  Following the ABA's third decision, CSL again failed to disclose and intentionally concealed its failure to comply with ABA requirements to current and prospective students and did not amend, update, or otherwise correct

4

its website and other publicly available literature and statements related to its compliance with ABA requirements. (*Id.* at ¶ 12).

CSL had actually requested the ABA to keep confidential its findings related to ABA compliance because "if students and prospective students were aware of the ABA's findings of noncompliance, that would have a 'profound impact on admissions' because: (1) knowledge of the ABA's findings would make applicants 'much less likely to enroll;' and (2) such a disclosure would 'effectively tell applicants to beware of attending the Charlotte School of Law.'" (*Id.* at ¶ 13, Exhibit B, at 11-12). In addition, CSL argued to the ABA that public disclosure of its noncompliance would "have an adverse impact on [CSL's] ability to retain high-performing students," because it would "inevitably create anxiety on the part of high-performing students and make their transfer more likely." (*Id.*, Exhibit B, at 12).

In August 2016, CSL appealed aspects of the ABA's third decision, and on October 21, 2016, the ABA held a hearing at which Jay Conison testified on CSL's behalf. (*Id.* at ¶ 72, Exhibit B, at 7). At that hearing, Jay Conison testified that CSL is "not appealing that conclusion of noncompliance with Standards 301 and 501," despite the school's "disappointment" with the conclusion. *Id.* Again, this material information was not communicated to students and prospective students.

On November 14, 2016, the ABA found for the fourth time in almost two years that CSL was not in compliance with its Standards. On this date, the ABA found CSL "not in compliance" with Standards 301(a), 501(a), and 501(b), that the issues of noncompliance with these standards "are substantial and have been persistent," and that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." (*Id.* at ¶¶ 14, 73, Exhibit B, at 7-8). Because CSL had failed to disclose to its current and prospective students its non-

5

compliance with ABA Standards prior to November 14, 2016, the ABA ordered remedial actions, including public disclosure, and placed CSL on probation, effective November 14, 2016. *Id*. Therefore, CSL did not make any type of public disclosure regarding its non-compliance with ABA requirements for rigorous curriculum, admissions process, bar passage rates, and attrition rates until it was forced to do so by the ABA. This was the first time current and prospective students were informed of CSL's noncompliance. *Id.*

On December 19, 2016, after reviewing the ABA's findings, the DOE denied CSL's Recertification Application to Participate in the Federal Student Financial Assistance Program, after finding that CSL's "substantial" omissions regarding "the nature of its educational program" to the DOE and current and prospective students were made in order to gain prospective students' admission and prevent current students from transferring. (*Id*. at ¶ 15, Exhibit B). Specifically, the DOE found that CSL failed to inform students and prospective students of the "nature and extent" of CSL's accreditation and the "appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet." (*Id*. at ¶ 76, Exhibit B, at 10). Moreover, the DOE found that prior to the ABA's November 2016 announcement, the DOE was unaware of any public statements that would have informed a student or prospective student that the ABA had found the school to be out of compliance with the Standards, or that the ABA had determined that CSL had "not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." *Id*. Nor was the DOE aware of any statement or disclosure during that period by CSL that the ABA had determined that the school was "admitting applicants who do not

6

appear capable of satisfactorily completing its program of legal education and being admitted to the bar." *Id.*

The DOE stated that CSL's statements on its website that it was in full compliance with the ABA could lead a current or prospective student to "conclude that the 2011 finding of 'full compliance' by the ABA was the final word as to the institution's compliance with the ABA's accreditation standards." (*Id.* at ¶ 77, Exhibit B, at 11). The failure of CSL to disclose the current status of its ABA accreditation was misleading insofar as it had the likelihood or tendency to deceive reasonable students and prospective students about the current status, nature, and extent of CSL's accreditation. *Id.* Moreover, the DOE found that CSL's representation that it created a "rigorous curriculum . . . to ensure that [CSL] students are equipped with practical skills that will allow them to thrive in a professional setting," was also misleading, as it failed to inform students that:

> (1) the ABA has specifically and repeatedly concluded that CSL has not maintained a "rigorous" program of legal education, that its failures in this regard are "substantial" and "persistent," and that CSL's plans to come into compliance with that standard have not proven effective or reliable; and (2) the positioning of CSL's description of its curriculum as "rigorous" directly beneath the discussion of compliance with the ABA standards (which use the word "rigorous" to describe what is expected of a compliant program) has the likelihood or tendency to leave students and prospective students with the false impression that CSL was compliant with that very requirement by the ABA.

(*Id.* at ¶ 78, Exhibit B, at 11). Finally, the DOE found that CSL substantially misrepresented the bar passage rates of CSL graduates in an interview with the *Charlotte Business Journal* published on November 30, 2016. (*Id.* at ¶ 81, Exhibit B, at 12). In that interview, Defendant Chidi Ogene stated that "[i]f you look at bar pass rates between 2009 and 2013, we were consistently at or above the state bar average pass rate. That is an incredible feat for a new school." *Id.* However, out of the nine sittings of the North Carolina bar exam (between July 2009 and July 2013),

7

CSL's first-time bar passage rate was actually below the state average five times (with a maximum differential of -13.33%) and above the state average only four times (with a maximum differential of 7.4%). *Id*.

Plaintiffs allege that as a result of CSL and the other Defendants' actions, Plaintiffs have spent millions of dollars in tuition and taken on significant debt which will be difficult to repay. Many were forced to drop out and find a different profession, as it was too late for them to transfer to other law schools to finish their JD degree, and they lacked the financial ability to do so. Of those that were able to successfully transfer to another school, many were forced to take extra credits, incurring additional student loans, as many of the CSL credits were not accepted for transfer. The Plaintiffs also fear that repayment of their student loans will prove difficult, as employment in the legal profession may be elusive due to the reputation of CSL in the legal community.

Plaintiffs filed this action on behalf of themselves and all individuals enrolled as students at CSL any time after January 1, 2015, alleging Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Fraud and Constructive Fraud; Negligent Misrepresentation; Unjust Enrichment; Unconscionability; Breach of Fiduciary Duties; North Carolina Unfair and Deceptive Trade Practices Act; Declaratory Judgment; and Punitive Damages. The Defendants have moved to dismiss all claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

II.    **DISCUSSION**

    **A.  Standard for 12(b)(6) Motions to Dismiss**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting from *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). However, "[a] court is not required to accept [t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements." *Id.*

### B. Breach of Contract

For breach of contract claims, the allegations regarding the terms of a contract must be "'definite and certain or capable of being made so' such that the parties 'assent to the same thing, in the same sense.'" *McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 981 (M.D.N.C. 2011), *aff'd in part, rev'd in part, dismissed in part sub nom. Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) (internal citation omitted). "Thus, a contract exists only if there is mutual intent to contract and an agreement on sufficiently definite terms to be enforceable." *Id.* Failure to allege the "specific contract terms which were breached by Defendants . . . obviously fall[s] far short of the line of 'plausibility of entitle[ment] to relief.'" *Page v. Select Portfolio Servicing, Inc.*, No. 1:12CV900, 2013 WL 4679428, at *3 (M.D.N.C. Aug. 30, 2013), report and recommendation adopted, No. 1:12CV900, 2013 WL 5462282 (M.D.N.C. Sept. 30, 2013) (quoting *Twombly*, 550 U.S. at 557); *see also Houck v. Lifestore Bank*, No. 5:13-CV-66-DSC, 2014 WL 197902, at *3 (W.D.N.C. Jan. 15, 2014) (ruling that "[b]ald assertions" about "improper" conduct were "insufficient" to allege breach of contract). In the higher education setting, a student must point to a "specific promise" about which a court can make an "objective assessment" without evaluating the "nuances of educational processes" to state a claim for breach of contract. *Ryan v. Univ. of N.C. Hosps.*, 494 S.E.2d 789, 791 (N.C. Ct. App. 1998).

9

Plaintiffs herein do not identify any written contract and provide no meaningful substance (or even the date) of any such alleged agreement. Plaintiffs' conclusory allegations contain no factual content of any "specific promises" about the quality of education, ABA accreditation, or a "rigorous curriculum." *Id.* Because none of the alleged promises upon which Plaintiffs rely appear in any material Plaintiffs cite, their breach of contract claims must fail. *See, e.g.*, *Rouse v. Duke Univ.*, 869 F. Supp. 2d 674, 682–83 (M.D.N.C. 2012) (rejecting breach of contract allegation because it relied on a provision that was not incorporated into any specific agreement with Plaintiff). Moreover, Plaintiffs' reference to CSL's website (SAC ¶ 85, Ex. A) is wholly ineffectual to state a contract claim. Indeed, North Carolina courts have repeatedly rejected nearly identical contract claims based on such materials. *See McFadyen*, 786 F. Supp. 2d at 982.

Not only do Plaintiffs' allegations fail to allege a cognizable breach of contract claim, but the claim is an impermissible attempt to allege a cause of action for educational malpractice. North Carolina courts have repeatedly rejected such claims.[7] As the Court in *McFadyen* stated: "[T]he [breach of contract] claim must not involve 'inquiry into the nuances of educational processes and theories.' . . . [T]he Court will not . . . open up any type of 'educational malpractice' claim." *Id.* at 982–83 (quoting *Ryan*, 494 S.E. 2d at 791); *see Rouse*, 869 F. Supp. 2d at 683 (rejecting claims based on vague assurances of educational quality and experience as "too general to be enforceable as a matter of contract"); *Thomas v. Olshausen*, No. 3:07CV130-MU, 2008 WL 2468738, at *2 (W.D.N.C. June 16, 2008) (ruling that claims that "Defendants denied [Plaintiff] or his son access to more challenging educational programs . . . should be

---

[7] Numerous other courts throughout the country have likewise refused to acknowledge claims for educational malpractice. *See, e.g.*, *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 403 (Pa. Super. Ct. 1992) (affirming dismissal of contract claim alleging that school provided inadequate instruction because such claims "for educational malpractice, whether framed in terms of tort or breach of contract" are not recognized); *Lawrence v. Lorain Cty. Cmty. Coll.*, 713 N.E.2d 478 (Ohio Ct. App. 1998) (affirming dismissal of claims, including violation of state consumer practices act and breach of contract, by former student alleging that school provided a substandard education).

dismissed as there is no cognizable claim for educational malpractice under North Carolina law"), *aff'd*, 305 Fed. Appx. 55 (4th Cir. 2008). Indeed, the North Carolina Court of Appeals recently reaffirmed that "educational malpractice claims . . . are not recognized under North Carolina law." *Arnold v. University of N.C. at Chapel Hill*, No. COA16-573, 2017 WL 1382212, at *3 (N.C. Ct. App. Apr. 17, 2017) (unpublished table decision). Thus, a breach of contract claim requires more than an allegation that "the education was not good enough." *Ryan*, 494 S.E.2d at 791. Accordingly, Plaintiffs' Breach of Contract claim fails.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing "only arises where a party to a contract performs its contractual obligations in bad faith." *Devlin v. Wells Fargo Bank, N.A.*, No. 1:12-CV-000388-MR, 2014 WL 1155415, at *10 (W.D.N.C. Mar. 21, 2014), *aff'd*, 585 F. App'x 171 (4th Cir. 2014). "In the absence of an enforceable contract, the parties cannot have an implied covenant of good faith and fair dealing." *Giuliani v. Duke Univ.*, 1:08CV502, 2010 WL 1292321, at *9 (M.D.N.C. Mar. 30, 2010). Since the Court holds that there is no enforceable contract herein, this claim must likewise fail.

### D. Unjust Enrichment

In Count V of their Second Amended Complaint, Plaintiffs allege that Defendants were unjustly enriched by the tuition and fees collected from Plaintiffs as a result of their wrongful conduct. To plead unjust enrichment, a plaintiff must allege facts demonstrating: "(1) one party conferred a benefit upon the other party; (2) the benefit was not 'conferred officiously, . . .' ; (3) the benefit was not gratuitous; (4) the benefit was measureable; and (5) the defendant consciously accepted the benefit." *Law Offices of John L. Juliano, P.C., v. Jensen*, 2016 WL 7240176, at *3 (4th Cir. Dec. 15, 2016) (applying North Carolina law); *see also JPMorgan*

*Chase Bank, Nat'l Ass'n v. Browning*, 750 S.E. 555, 559-60 (N.C. Ct. App. 2013). Plaintiffs have failed to state a plausible claim for unjust enrichment.

First, there is no claim for unjust enrichment where a benefit is given officiously, that is to say, without "solicit[ation] or induce[ment]." *Homeq v. Watkins*, 154 N.C. App. 731, 733, 572 S.E.2d 871, 873 (2002) ("Absent such inducement or solicitation, Defendants are simply not liable for unjust enrichment, even if they did benefit from [plaintiff]'s actions."); *Fireman's Fund Ins. Co. v. Safeco Ins. Co. of Am.*, No. 3:07-CV-86, 2007 WL 4233317, at *2 (W.D.N.C. Nov. 28, 2007) (dismissing unjust enrichment claim where plaintiff failed to allege that defendant "acted to induce or solicit [plaintiff's] actions"). Here, Plaintiffs do not allege that Defendants actively recruited them or solicited their attendance.

Secondly, a claim for unjust enrichment must plausibly allege that the enrichment was in fact "unjust." Payment of tuition and fees cannot be unjust if the students received the benefit for which they paid. There are no allegations that the Defendants failed to provide classes in legal instruction, professors to teach those classes, or classrooms in which students could be taught. In short, the Plaintiffs paid for a legal education and in return they received a legal education.[8] Any inquiry into the quality or value of the services provided in return for Plaintiffs' tuition and fees constitutes an impermissible foray into educational malpractice.

---

[8] *See Gerboc v. ContextLogic, Inc.*, No. 1:16 CV 928, 2016 WL 6563684, at *6 (N.D. Ohio Nov. 4, 2016) (appeal filed Dec. 20, 2016) (dismissing unjust enrichment claim where Plaintiff paid the listed purchase price for speakers and received them even though defendant's "Website, which made it appear as though [plaintiff] was getting a great deal, was fictitious" because plaintiff "received the benefit of what he paid for"); *Augustson v. Bank of Am., N.A.*, 864 F. Supp. 2d 422, 439 (E.D.N.C. 2012) (dismissing unjust enrichment claim where complaint did not "plausibly allege circumstances creating a legal or equitable obligation for [defendant] to account for a benefit" because "plaintiffs received the loan at the interest rate that each agreed to pay").

### E. Unconscionability and Punitive Damages

Count VI of Plaintiffs' Complaint purports to state a claim for unconscionability, alleging that the amount Plaintiffs paid in tuition and fees was unconscionable as a matter of law because of Defendants' alleged conduct. (SAC ¶ 105.) However, under North Carolina law, "unconscionability is an affirmative defense," not an independent cause of action. *Tillman v. Commercial Credit Loans, Inc.*, 655 S.E.2d 362, 369 (N.C. 2008). Accordingly, it must be dismissed as a claim.

Likewise, Plaintiffs' stand-alone claim for punitive damages (Count X) also must also be dismissed because "punitive damages do not and cannot exist as an independent cause of action." *Iadanza v. Harper*, 611 S.E.2d 217, 223 (N.C. Ct. App. 2005).

### F. Breach of Fiduciary Duty

Under North Carolina law, to state a claim for breach of fiduciary duty, a plaintiff must show that "(1) the defendant owed the plaintiff a fiduciary duty of care; (2) the defendant violated that duty; and (3) the breach of duty proximately caused the plaintiff's injury." *Marketel Media Inc. v. Mediapotamus, Inc.*, Nos. 13-cv-427, 13-cv-693, 2015 WL 2401001, at *7-8 (E.D.N.C. May 19, 2015); *see also Green v. Freeman*, 749 S.E.2d 262, 268 (N.C. 2013). Defendants contend that Plaintiffs' claim must fail as they cannot establish the first element – the existence of a cognizable fiduciary relationship between themselves and Defendants.

The North Carolina Supreme Court has stated that a fiduciary relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Abbitt v. Gregory*, 160 S.E. 896, 906 (N.C. 1931). Ordinarily, the existence or nonexistence of a fiduciary duty is dependent on the circumstances of each case and is generally

a question of fact for the jury. *Stamm v. Salomon*, 551 S.E.2d 152, 158 (N.C. Ct. App. 2001), *rev. denied*, 560 S.E.2d 139 (N.C. 2002). Nevertheless, North Carolina courts have generally refused to recognize a fiduciary relationship as a matter of law in certain cases, such as cases between an employer and employee and between businesses with equal bargaining power negotiating at arm's length. *See McCants v. National Collegiate Athletic Ass'n*, 201 F.Supp.3d 732 (M.D.N.C. 2016). Most importantly with regard to this case, courts applying North Carolina law have repeatedly rejected attempts to hold schools to a fiduciary standard vis-à-vis their students.[9] *See, e.g.*, *Ryan v. Univ. of N.C. Hosps.*, 609 S.E.2d 498, *4 (N.C. Ct. App. 2005) (rejecting the imposition of a fiduciary duty in the "academic setting"); *McCants*, 201 F. Supp. 3d at 749 (finding no fiduciary relationship exists because "North Carolina courts have been reluctant to extend the concept of fiduciary relationships to the academic setting"); *J.W. v. Johnston Cty. Bd. of Educ.*, No. 5:11-CV-707-D, 2012 WL 4425439, at *14 (E.D.N.C. Sept. 24, 2012) (same). Plaintiffs' attempts to distinguish these cases are unavailing.

In *Ryan*, the court explained that divided loyalties that are inherent to an academic setting preclude the imposition of a fiduciary duty:

> Although defendants were plaintiff's teachers and advisors, they also had to serve other interests. First, defendants had to serve the objectives of the institution by ensuring that its rules and regulations were followed. Second, defendants were required to protect the public by ensuring that only qualified doctors graduated from the program. Because defendants had divided loyalties, this case is unlike other fiduciary relationships in which the fiduciary must act primarily for the benefit of another.

---

[9] Numerous courts throughout the country have likewise concluded a fiduciary relationship does not exist between schools and their students. *See, e.g.*, *Hendricks v. Clemson Univ.*, 353 S.C. 449, 459, 578 S.E.2d 711, 716 (2003) (relationship between a student and an academic advisor is not fiduciary in nature); *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 719 (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014); *Leary v. Wesleyan Univ.*, No. CV055003943, 2009 WL 865679, at *12 (Conn. Super. Ct. Mar. 10, 2009); *Ho v. Univ. of Texas*, 984 S.W.2d 672, 693 (Tex. App. 1998); *see also Bradshaw v. Rawlings*, 612 F.2d 135, 140 (3d Cir. 1979) (because society "considers the modern college student an adult," no specific duty of care will be found where "the circumstances show that the students have reached the age of majority and are capable of protecting their own self interests").

609 S.E.2d at *4; *see McCants*, 201 F. Supp. 3d at 748-49 (concluding that divided loyalties

preclude a fiduciary duty in "academic" context).  Here, as in *Ryan*, CSL (and by extension, the

other Defendants) could not possibly act exclusively for the benefit of Plaintiffs, because it

simultaneously has loyalties to and must serve the interests and demands of many others,

including the institution as a whole, the ABA, the North Carolina Board of Governors, and the

public as an educator of individuals entering a licensed profession.

 The absence of any North Carolina court decision extending a fiduciary duty to an

academic context is fatal to the Plaintiffs' claim.  *See McCants*, 201 F. Supp. 3d at 748–749

("[A] federal court sitting in diversity, as this Court, cannot expand North Carolina law or policy

'farther than any North Carolina court has been willing to go.'" (citation omitted)). The court in

*McCants* explained:

> Because North Carolina courts have been reluctant to extend the concept of
> fiduciary relationships to the academic setting, *see Ryan*, 2005 WL 465554, at *4,
> and without a clear signal that they are willing to do so, the Court cannot expand
> North Carolina law by concluding that Plaintiffs' Complaint plausibly alleges a
> fiduciary relationship between the NCAA and Plaintiffs.

*Id.*  The court in *J.W.* employed the same reasoning in its refusal to recognize a fiduciary duty

between a special education student and school administration:

> [P]laintiffs have not cited any North Carolina appellate opinions holding that a
> fiduciary relationship exists in the middle school setting . . . . Because this court is
> analyzing North Carolina law under its supplemental jurisdiction, *this court may
> not expand North Carolina law to create a fiduciary duty*. . . .

2012 WL 4425439, at *15 (emphasis added).   Accordingly, the Court concludes that Plaintiffs

have failed to allege a plausible claim of breach of fiduciary duty and this claim must be

dismissed.

### G. Constructive Fraud

"To establish constructive fraud, a plaintiff must show that the defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction." *Crumley & Assoc., P.C. v. Charles Peed & Assoc., P.A.*, 730 S.E.2d 763, 767 (N.C. Ct. App. 2012) (citation omitted). As the Court has already determined that there is no breach of fiduciary duty, this claim must likewise be dismissed.

### H. Fraud

In order to state an actionable claim of fraud under North Carolina law, a plaintiff must allege the following elements: "(1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage." *Breeden v. Richmond Community College*, 171 F.R.D. 189, 194 (M.D.N.C. 1997) (citation omitted). In a case for "fraudulent concealment or nondisclosure, the plaintiff must additionally allege that all or some of the defendants had a duty to disclose material information to him as silence is fraudulent only when there is a duty to speak." *Id.*

In North Carolina, the general rule is that:

[s]ilence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other . . . party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances . . . [T]he silence must, under the conditions existing, amount to fraud, because it amounts to an affirmation that a state of things exists which does not, and the uninformed party is deprived to the same extent that he would have been by a positive assertion.

*Id.* (quoting *Setzer v. Old Republic Life Ins. Co*., 126 S.E.2d 135, 137 (N.C. 1962).

The SAC sufficiently pled facts which establish that: (1) there were concealments of material fact by the Defendants (SAC ¶¶ 63-84, 93-100); (2) that the Defendants reasonably calculated to deceive the Plaintiffs (SAC ¶¶ 77-84); (3) which were made with the intent to deceive the Plaintiffs (*Id.*); (4) that did in fact deceive the Plaintiffs (SAC ¶¶ 29-34, 45-55); and (5) resulted in damage to the Plaintiffs. (SAC ¶¶ 29-34, 45-55, 124-26). Plaintiffs have also sufficiently alleged facts that would give rise to a duty on the part of the Defendants to speak and communicate the omitted information to Plaintiffs. This duty need not amount to a fiduciary duty, but may arise "from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances." *Breeden,* 171 F.R.D. at 194.

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity….". The Fourth Circuit has further defined Rule 9(b)'s particularity requirement, saying,

> [t]o meet this standard, a[] . . . plaintiff must, at a minimum, describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison I*, 176 F.3d at 784 (internal quotations omitted). These facts are often "referred to as the 'who, what, when, where, and how' of the alleged fraud."

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). In order to comply with the pleading requirements of Rule 9(b) with respect to fraud by omission, a plaintiff usually will be required to allege the following with reasonable particularity:

> (1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those defendant(s) gained by withholding information, (6) why plaintiff's reliance on

17

the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance.

*Breeden*, 171 F.R.D. at 195-96.

Defendants contend that Plaintiffs' allegations fail to meet this heightened pleading requirement. The Court disagrees. The SAC pled with particularity the who, what, when, where, and how of the alleged fraud, as well the circumstances that gave rise to a duty to speak. Moreover, Plaintiffs described the Defendants' relationships to the claims and identified their specific participation in the "Facts" section of the Plaintiffs' SAC. Despite Defendants' arguments to the contrary, the Court also finds that Plaintiffs have plausibly alleged facts that establish their reasonable reliance and establish that Defendants' fraudulent omissions proximately caused their injuries.

## I. Negligent Misrepresentation

Negligent misrepresentation occurs when a party justifiably relies to his/her detriment on information provided without reasonable care by another who owes the relying party a duty of care. *Jordan v. Earthgrains Baking Cos*., 576 S.E.2d 336, 339 (N.C. Ct. App. 2003). A plaintiff must show that the defendant owed a duty to provide complete and accurate information and that such duty was breached. *Simms v. Prudential Life Ins. Co. of Am*., 537 S.E.2d 237, 240 (N.C. Ct. App. 2000). North Carolina courts have described a breach of the duty of care owed as:

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id*. at 241 (citing *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 513 S.E.2d 320, 323-24 (N.C. 1999). The Plaintiffs have pled facts, which taken as true, are sufficient for this Court to

draw the reasonable inference that Defendants are liable for negligent misrepresentation. Accordingly, their negligent misrepresentation claim, like their fraud claim, stands.

### J. North Carolina Unfair and Deceptive Trade Practices Act

To prevail on a claim for unfair and deceptive trade practices, a claimant must show: "(1) an unfair or deceptive act or practice . . . , (2) in or affecting commerce, and (3) which proximately caused actual injury to claimant . . .." *Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol*, 893 F. Supp. 526, 541 (E.D.N.C. 1994); *see also Canady v. Mann*, 419 S.E.2d 597, 602 (N.C. Ct. App. 1992), *disc. rev. improvidently allowed*, 429 S.E.2d 348 (N.C. 1993). North Carolina courts apply a three-factor analysis to determine the sufficiency of a claim under N.C. Gen. Stat. §75-1.1. *See Furr v. Fonville Morisey Realty, Inc.*, 503 S.E.2d 401 (N.C. Ct. App. 1998). First, there must be a practice, act, or representation that falls within the broad definition of "unfair" or "deceptive." North Carolina courts generally have described a practice as "unfair" when it offends established public policy, or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *See Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 621 (N.C. 1980), *overruled on other grounds*, *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988). An act or practice is "deceptive" if it has the tendency or capacity to deceive. *Johnson*, 266 S.E.2d at 622; *see also Norman v. Loomis Fargo & Co.*, 123 F. Supp. 2d 985, 989 (W.D.N.C. 2000) (quoting *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981)).

North Carolina courts have traditionally applied this statute liberally, including claims involving negligent misrepresentation and failure to disclose material information. *See Gilbane Building Co. v. Federal Reserve Bank of Richmond*, 80 F.3d 895, 903 (4th Cir. 1996); *Kron Medical Corp. v. Collier Cobb & Assocs.*, 420 S.E.2d 192, 196 (N.C. Ct. App.), *disc. rev. denied*,

424 S.E.2d 910 (N.C. 1992). In essence, unfair and deceptive acts and practices can be explained as follows:

> A party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position. The concept of "unfairness" is broader than and includes the concept of "deception." An act or practice is deceptive if it has the capacity or tendency to deceive. The facts surrounding the particular transaction and the impact the practice has in the marketplace determined whether a particular act is unfair or deceptive. Further, in determining whether a representation is deceptive, its effect on the average consumer is considered.

*Warfield v. Hicks*, 370 S.E.2d 689, 693 (N.C. Ct. App. 1988) (citations omitted).

Because Plaintiffs' fraud claim survives dismissal, the UDTPA claim survives as well, as it is largely based on Defendants' alleged fraudulent conduct. Accordingly, Defendants' Motion to Dismiss is denied as to the UDTPA claim.

### K. Declaratory Judgment

In Count IX of their SAC, Plaintiffs seek a declaratory judgment against "all Defendants" including Defendant DOE to discharge all of Plaintiffs' debt that was acquired in order to attend CSL's JD program on the basis that CSL substantially misrepresented its JD program. They allege that those misrepresentations were the reason Plaintiffs acquired the debt in the first place, and seek a declaratory judgment that CSL's fraud is a defense to the repayment of the student loans issued by the DOE to Plaintiffs and the class.

The DOE has moved to dismiss this claim against it pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.[10]  In considering a motion to dismiss under Rule 12(b)(1), a court normally views the facts in the light most favorable to the plaintiff, but if it receives evidence concerning the issue of subject matter jurisdiction, "the court may weigh the evidence in determining whether the facts support the jurisdictional allegations." *Lovern v. Edwards*, 190

---

[10] This is Plaintiffs' only claim against Defendant DOE.

Case 3:17-cv-00190-GCM   Document 92   Filed 09/05/17   Page 20 of 24

F.3d 648, 654 (4th Cir. 1999)); *see also Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999). In making this determination, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the [motion] to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see U.S. ex rel. Saidiani v. NextCare, Inc*., No. 3:11-cv-141-GM, 2014 WL 4672417, at *2 (W.D.N.C. Sept. 18, 2014) (granting Rule 12(b)(1) motion for lack of standing in False Claims Act case). In addition, "[a] court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Jeandron v. Bd. of Regents of Univ. Sys.of Maryland*, No. 12-1724, 510 F. App'x 223, 227 (4th Cir. Feb. 14, 2013) (unpublished) (quoting Fed. R. Evid. 201(b)); *see, e.g.*, *Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (collecting cases taking judicial notice of information posted on official public websites of government agencies).

Defendant DOE argues that Plaintiffs lack standing to sue for declaratory relief because they have not asserted a concrete and particularized injury traceable to government action. Article III of the Constitution limits the federal courts to the resolution of live "cases" and "controversies." U.S. Const., art. III, § 2. The doctrine of standing is an essential aspect of this case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defs.of Wildlife*, 504 U.S. 555, 561 (1992). To meet that burden, Plaintiffs must allege (1) they have suffered an actual or imminent, concrete and particularized injury, (2) that is fairly traceable to an action by the DOE that they are challenging, and (3) that is likely to be redressed by the declaratory relief Plaintiffs have requested. *See id*. at 560-61; *see*

21

*also Taubman Realty Grp. Ltd. v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). Where a plaintiff does not establish each of the elements of standing, a court must dismiss that claim for lack of subject matter jurisdiction. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc*., 454 U.S. 464, 475-76 (1982).

Plaintiffs seek a declaratory judgment "that CSL's fraud is a defense to the repayment of the student loans issued by [Education] to Plaintiffs and the class, that the loans should be discharged, and th[at] any payments made by them are due to be refunded." (SAC ¶ 123). But Plaintiffs have not alleged that the DOE has determined not to discharge Plaintiffs' loans. Such a determination could only result from Plaintiffs asserting a borrower defense through the DOE's administrative process or in a proceeding to collect on a Direct Loan, *see* 34 C.F.R. § 685.206(c)(1); Federal Student Aid, An Office of the United States Department of Education, Borrower Defense to Repayment, https://studentaid.ed.gov/borrower-defense. Plaintiffs do not allege that they have even attempted to apply for federal loan forgiveness based on a borrower defense through the DOE's administrative process. As such, the DOE has not had the opportunity to review Plaintiffs' applications and reach a decision. Accordingly, Plaintiffs have not made the required showing that they are in immediate danger of sustaining any "concrete and particularized" injury that can be traced to the DOE.[11] Because Plaintiffs have failed to show that "there is a substantial controversy, . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," any decision by this Court on this claim would be an improper advisory opinion on an abstract question. *Maryland Cas. Co. v. Pacific Co*., 312 U.S.

---

[11] The DOE also argues that Plaintiffs have failed to allege an applicable waiver of sovereign immunity that would allow them to raise this claim against the DOE. In light of the Court's finding that Plaintiffs lack standing to sue, it is unnecessary to reach this argument.

270, 273 (1941). Plaintiffs' request for a declaratory judgment against the DOE is therefore dismissed for lack of subject matter jurisdiction.

Plaintiffs' declaratory judgment claim also fails under Rule 12(b)(6) for similar reasons, as argued by the other Defendants. Plaintiffs have failed to allege that they have exhausted their administrative remedy of adjudicating their borrower defense to repayment claims before the DOE. It is "long settled" that judicial relief is not appropriate "until the prescribed administrative remedy has been exhausted." *Phillip Morris, Inc. v. Block*, 755 F.2d 368, 369 (4th Cir. 1985) (internal quotation omitted).

Plaintiffs do not dispute that they have failed to exhaust their administrative remedies, but instead contend that exhaustion would be "futile or inadequate." However, Plaintiffs do not provide any evidence to support their contentions of futility or inadequacy, other than speculation. They cannot claim undue delay because, as noted, they have not even filed borrower defense to repayment claims. Mere complaints about having to wait for a decision from the DOE are insufficient to waive the exhaustion requirement. *See Id*. at 369-71 (rejecting the plaintiff's argument that it would be "inherently unfair and inefficient" to spend time and money pursuing the prescribed administrative remedies, and stating that the court could not "tamper with the administrative process" or "expedite the process"). Accordingly, Plaintiffs' declaratory judgment claim is premature and must be dismissed.

For the foregoing reasons,

IT IS THEREFORE ORDERED that the CSL Defendants' Motion to Dismiss for failure to state a claim is GRANTED IN PART AND DENIED IN PART. All claims are dismissed except Plaintiffs' claims for fraud, negligent misrepresentation, and unfair and deceptive trade practices; and

23

IT IS FURTHER ORDERED that the DOE's Motion to Dismiss for lack of subject matter jurisdiction as to Plaintiffs' sole claim against the DOE is hereby GRANTED.

Signed: September 5, 2017

Graham C. Mullen
United States District Judge